NOTE.—Defendant before trial ascertained that the rates set forth in plaintiff's statement were correct and it paid up in full.

---

## Du Bois Garage, Inc., v. Hines, Director General.

*Negligence—Railroads—Automobiles—Crossings—"Stop, look and listen" —Signals—Back-up hose on caboose—Train hands—Act of June 19, 1911— Master and servant.*

1. A railroad company cannot be charged with negligence for an injury at a public crossing in not having a back-up hose on a caboose, where it appears that the caboose was all that was ahead of the engine, that the engine's whistle was the public signal, and had been properly given, and that the back-up hose was used only on the main line, and that the accident happened during a shifting movement.

2. A railroad company cannot be charged with violating the Act of June 19, 1911, P. L. 1053 (since repealed by the Act of May 5, 1921, P. L. 385), in operating a train composed only of an engine and caboose, where it appears that there was on the train an engineman, fireman, conductor and two brakemen.

3. Where the driver of an automobile drives on a railroad track at a public crossing without having stopped, looked and listened, the railroad company is not liable for the wreck of the automobile.

4. The neglect of trainmen to whistle or ring at a public crossing will not excuse a person struck by the train, if by the due exercise of his faculties he could have avoided the accident.

5. It is not necessary, in order to constitute the driver of an automobile the servant of the owner, that he should be entitled to compensation, or that he was in the performance of a duty incident to a general employment as the servant of the owner; if he was acting for the owner in driving the car for the transportation of a passenger who paid no fare, and was injuriously negligent, the owner is affected by such negligence.

Motion to take off non-suit. C. P. Jefferson Co., Aug. T., 1919, No. 331.

*Lisle D. McCall,* for plaintiff; *Raymond E. Brown,* for defendant.

CORBET, P. J., Dec. 30, 1922.—The plaintiff sued for injury to an automobile owned by it, which, while it was being driven across and was on the track of a railroad then, Sept. 1, 1918, being operated by the United States Railroad Administration, was struck by a train on the track, composed of a caboose or cabin and locomotive coupled together, with the caboose ahead, while the train was crossing Main Street, a wide paved street in the Borough of Reynoldsville, on which the automobile was traveling.

The negligence charged in the statement of claim is:

*(a)* Failure and neglect to have a proper back-up hose on its caboose so that it might give warning to persons about to cross its tracks that it was about to cause said train to back over said crossing.

*(b)* Failure to have a sufficient number of men to operate said train as provided by the law of Pennsylvania.

*(c)* Failure and neglect to give a reasonable or adequate warning of the approach of said train to said crossing by ringing the bell or otherwise, and starting its engine with and at an excessive and improper speed, and as a result of the negligence set forth, the cars of defendant were driven against the automobile of plaintiff and thereby caused the damage complained of.

It is questionable if the plaintiff showed the defendant guilty of negligence in any particular.

The driver of the automobile utterly ignored the imperative rule to stop, look and listen before driving on to the railroad track, and drove thereon without a stop. The rule is for the benefit of both prudent and imprudent travelers. Until he has stopped, concentrated his senses of sight and hearing on the hazard of the particular crossing he is about to venture, and can then truly say, while himself alert and with his faculties fully concentrated to observe, that no warning was given him, is he in a position to say that the doing of this thing or the omission to do another thing would have saved him? Warnings of train movements to one about to cross a railroad are not ordinarily calculated to be so bright, conspicuous, glaring, intense and visible, or so arresting, loud, piercing, penetrating, shrill and vociferous as to attract attention from every one in the vicinity, no matter how careless, inattentive, indifferent, unobservant, negligent or reckless he may be, but are ordinarily sufficient if adequate to give notice to one entitled to notice who gives proper attention to look and listen for them.

In the present case there was no presumption of negligence against the defendant: Pennsylvania R. R. Co. *v.* Goodman, 62 Pa. 329. The party who claims damages by reason of the negligent act of another must show not only that the other party was negligent, but that his injuries are the result of such negligence. The complaining party has no cause of action unless the wrong-doer's act produced the injuries complained of: Reddington *v.* City of Philadelphia, 253 Pa. 390; Stern *v.* Reading, 255 Pa. 96; Flanigan *v.* McLean, 267 Pa. 553.

It does not appear it was defendant's duty to have a back-up hose on the caboose, and that the injury resulted from its absence. It is not alleged to have been defendant's duty to give warning in that way. Plaintiff's witness, William Riggs, the conductor, testified, among other things: That they were a relay crew, going light that evening from Reynoldsville to Falls Creek, with engine and cabin, to get a train out of Falls Creek that night; that they got the engine east of the station, crossed the public highway to the west of it, went in on the station siding and got their cabin out; that the engineer was at his place; there was a brakeman on the cabin, and he believed the other brakeman was on the cabin on the rear end; that the block was against them, and he went up to the office to get the block, and also to get the back-up signal out of the office to put on the cabin, which was not a regular cabin at all and lacked this particular piece of equipment at that time; that when he last saw the cabin it was standing, he judged, about one-hundred and fifty feet from the crossing; that they were not supposed to use the back-up hose when not out on a road trip, but when out with a train, were supposed to have that coupled up and use it; that they hadn't coupled up their air at all, were not ready to go, and had no orders; that he would call it a shifting movement—the getting of a cabin out—until they got ready to leave; that in making a shifting movement he didn't think they needed a back-up hose on the car that was being pushed over a crossing; that after this shifting movement was made, and after the cabin was attached to the locomotive, if the accident

3 D. & C.

Du Bois Garage, Inc., *v.* Hines, Director General.

hadn't intervened, the train would have moved up to the station for the purpose of getting the air hose and getting orders; that all that was ahead of the locomotive was the cabin; that the whistle on the locomotive was the public signal and made a louder noise than the whistle on the airbrake hose; and that the locomotive whistle was blown for the block—four short blasts—when he was very close to the office, which was about two hundred feet east of the crossing.

The court was not referred to any law of Pennsylvania requiring a locomotive and cabin, or caboose, when coupled and moved together on a railroad, to be manned by any larger number of men than were in charge of the train in the instance under consideration. It was not within the provisions of the Act of June 19, 1911, P. L. 1053 (since repealed by Act of May 5, 1921, P. L. 385). We do not think there was any evidence of negligence by the defendant with respect to the sufficiency of the number of men to operate this train, which caused the injury complained of by plaintiff.

In addition to the sounding of the whistle, which has been referred to, both Clifford Brady and Landis Brochey, witnesses for the plaintiff, who were on a bridge 375 or 400 feet from the railroad crossing, and were passed by the automobile on its way to the crossing, testified to the visibility from where they were, of about half of the cabin as it was standing west of the crossing, and to the presence on the cabin of a red lamp or lantern. Had the occupants of the automobile been looking, they could have seen this red light from the bridge at least, and had it in view and seen its movement at any time thereafter, growing more and more distinct, with an enlargement of their view of the cabin and locomotive, as they drew towards the crossing. Brochey also testified there was a man standing on the cabin platform, but when the crash occurred he was not there, and that there was no ringing of the bell, nor any blowing of the whistle that he heard. Brady testified he heard a train shifting, but didn't pay any attention to the train, and didn't hear the locomotive whistle or the bell ringing; that he did not see the train start. The presumption in the first instance is that the trainmen did their duty. It is not apparent, we think, that there was any negligent failure to ring the bell which caused the injury.

Brochey testified that he saw the train start; that he judged it started as fast as it could—just started out quick. This states nothing definite, nor that the start was unusual or out of the ordinary. Nor was it accompanied or followed by any evidence that the train was going at an excessive and improper speed at the time of the collision. It seems to us the evidence was insufficient to warrant any finding by the jury that the start of the engine caused the injury. Apparently the driver of the automobile, ignoring his duty to stop, look and listen, went on to the railroad track directly in front of the train, at a speed of about fifteen miles on hour, and it was his negligence which caused the injury. As stated by plaintiff's witness, Conductor Riggs: "You can't just stop an engine on a short notice, as a man getting right on the crossing ahead of you. You couldn't stop. You have to have a little room to stop an engine."

The neglect of trainmen to whistle or ring at a public crossing will not excuse a person struck by the train if, by the due exercise of his faculties, he could have avoided the accident: Griffith *v.* Pennsylvania R. R. Co., 13 Lanc. Law Rev. 193. The principle is comprehensively stated in the *per curiam* opinion in Hovenden *v.* Pennsylvania R. R. Co., 180 Pa. 244 (in which plaintiff's witnesses all swore they heard no bell or whistle), thus: "Where a person steps upon a railroad track immediately in front of an approaching train

and is instantly struck and injured, he is conclusively guilty of contributory negligence and can recover nothing for the consequences."

However, aside from the question of the sufficiency of the evidence to warrant a finding of negligence by the defendant which caused or contributed to the injury, we have the undisputed and unquestioned fact that George Hawk, the driver of the automobile, was guilty of negligence in driving on the track in front of the train, in disregard of the rule to stop, look and listen. If he were the plaintiff's servant or agent, the defendant contends, by reason of that fact and his negligence, that there can be no recovery; while the plaintiff contends that even if the driver were negligent, it is not to be imputed to plaintiff and does not bar recovery by the latter if the defendant were negligent and thereby contributed to the injury. The only witness who testified to Hawk's position or relationship as driver was W. B. Alexander, assistant to plaintiff's manager. He testified: "A. I had just gotten back from my supper Sunday evening, Sept. 1st (1918), and Mr. Newton had sent for me to come over to the Elk Rooms, he wanted to see me. Q. What was said between you? A. Mr. Newton told me that it was necessary for him to be home Monday morning and that he would like to be taken down, or sent down that evening. Q. Did you permit Mr. Newton to have this car? A. Yes, sir. Q. Under what circumstances? A. Well, I told Mr. Newton—that was what was known as 'Gasless Sunday'—and I said, 'I will see if I'—I didn't have any delivery business—and I said, 'and I will see if I can send you down.' I said I would talk to the boys, and in the meantime one of the employees came in—he had been on duty all day and came in and had had his supper, and he volunteered to drive the car and take Mr. Newton home. Q. What was the name of that employee? A. George Hawk. Q. Was he in your employ that evening? A. No, sir; he had quit at 6 o'clock. Q. Had his day's work been finished? A. Yes, sir; at 6 o'clock. Q. And he volunteered to drive this car with Mr. Newton to his home? A. Yes, sir. Q. Where was Mr. Newton desirous of going? A. Pardus. Q. Where is that? A. All I know, you go through Reynoldsville and up towards Sandy Valley. . . . Q. Did you accept, or was Mr. Newton to pay compensation for the use of this car? A. No, sir; we wasn't doing any delivery work. It was just simply to get him home by his request. Q. Under whose control was this car? A. The car was loaned to Mr. Newton, and Mr. Hawk volunteered to drive it. Q. What was Mr. Hawk to do with the car? A. Take Mr. Newton home and drive the car back." . . . Cross-examination: "Q. You have testified that on that particular day, which was Sept. 1, 1918, Mr. Newton and you entered into some arrangement, whereby he was to be taken by one of your employees from Du Bois to his home in Pardus, is that correct? A. When I left Mr. Newton I hadn't promised that I would take him home or send him home; I said I would see what I could do. Q. That request was made to you by Mr. Newton? A. Mr. Newton requested me to see that he got home. Q. Had you previously volunteered to take him home? A. No, sir; I hadn't seen him before that at all. Q. And then, as I understand it, you acted only on his request? A. Only on his request. Q. Then did you go from your place of meeting Mr. Newton to your garage? A. Yes, sir. Q. And there you arranged for an automobile? A. Yes, sir. Q. And arranged for a driver? A. I didn't arrange for a driver, the driver volunteered. Q. To whom did the driver volunteer? To you or to Mr. Newton? A. Mr. Newton wasn't there. Q. Then, Mr. Hawk, the driver, must have volunteered to you? A. Yes, sir. Q. And you permitted him to do it? A. Yes, sir. Q. Where did the automobile driver find

3 D. & C.

Mr. Newton, do you know? A. At the Elk Club. Q. Were you there at the time? A. No, sir. Q. Did you see Mr. Newton more than once. A. No, sir. Q. So far as you know, Mr. Newton had no conversation with Mr. Hawk regarding the trip to Pardus? A. I don't know what took place between Mr. Newton and Mr. Hawk. I didn't see any of them after Mr. Hawk volunteered to go and after he got the car. He went over to the Elk Rooms, so far as I know. That's where Mr. Newton told me to send the car to in case I could get him home. Q. After Mr. Hawk volunteered to go you told him Mr. Newton was at the Elk Rooms, and for him to go over and get him? Is that correct? A. Yes, sir. . . . Q. Did you say that he had volunteered to you to take Mr. Newton to Pardus? A. Yes, sir."

The witness's statement, by way of conclusion, that "the car was loaned to Mr. Newton," is not warranted by the conversation between them, as it has been related by the witness. Mr. Newton wanted to be taken or sent to his home that evening. It does not appear that he either sought to hire or borrow an automobile. Witness said: "I will see if I can send you down." "I would talk to the boys." "Mr. Newton requested me to see that he got home." "When I left Mr. Newton I hadn't promised that I would take him home or send him home; I said I would see what I could do." Witness, who saw Mr. Newton only the one time, went from the place he met Mr. Newton, the Elk Rooms, to plaintiff company's garage. There he arranged for an automobile, and there George Hawk, an employee of plaintiff, whose day's work had been finished at 6 o'clock, at which time he had quit work, volunteered to Mr. Alexander, said plaintiff's assistant manager—Mr. Newton not being present, but then at the Elk Rooms—to drive the car and take Mr. Newton home, and was given permission to do so by Mr. Alexander. As testified by Mr. Alexander, Mr. Hawk, with the car, was to take Mr. Newton home and drive the car back. Those were the instructions given him by Mr. Alexander, and to that service he was restricted, and had no possession or control of the automobile for any other purpose. There was no evidence whatever that Mr. Newton was a party to this arrangement, or had any knowledge of it, or knew that the driver was a volunteer, or that he and the driver had any conversation regarding the trip to Pardus, or that Mr. Newton assumed or had anything whatever to do with the control or operation of the automobile. After the volunteering by Hawk, Mr. Alexander told him Mr. Newton was at the Elk Rooms, and for him to go over and get him.

Question to Mr. Alexander: "Did you accept, or was Mr. Newton to pay compensation for the use of this car? A. No, sir; we wasn't doing any delivery work. It was just simply to get him home by his request." Newton merely became a passenger and was being carried gratis. It nowhere appears that Hawk, in the operation of the automobile, was under the control or direction of Newton, or that he owed the latter any duty other than such as impliedly arose from his being plaintiff's driver.

It seems clear to us that the only inference deducible from the testimony is that George Hawk, the driver of the automobile, was the servant or agent of plaintiff; whether he was to receive compensation for the particular service he was then rendering for plaintiff or not.

The owner of a horse, lent without hire, is responsible for the negligence of the borrower, and if the negligence of the latter contributed to an accident, whereby the horse was killed, the owner cannot recover: Forks Township v. King, 84 Pa. 230.

In an action by Carson against a railway company for injuries to a team of

horses, wagon and harness, caused by collision with one of defendant's cars, while the team was being driven by Orr, his driver, it was held that Carson was affected by the contributory negligence of the driver and could not recover: Carson v. Federal Street & Pleasant Valley Ry. Co., 147 Pa. 219.

In Trout v. Altoona & Logan Valley Electric Ry. Co., 13 Pa. Superior Ct. 17, the plaintiff, a livery stable keeper, hired to one Samuel D. Hines a horse and buggy, which, while being driven by him on the streets of the City of Altoona, was injured in a collision with a car of the defendant company. The evidence disclosing that the driver was guilty of negligence in not exercising the ordinary precautions demanded by the law, it was held the plaintiff could not recover.

It would seem the principle which controlled the decisions in Forks Township v. King, 84 Pa. 230, and Trout v. Altoona & Logan Valley Electric Ry. Co., 13 Pa. Superior Ct. 17, no longer obtains in this State (Gibson v. Bessemer & Lake Erie R. R. Co., 226 Pa. 198, and Eline v. Western Maryland Ry. Co., 262 Pa. 33), yet the principle which, in this respect, controlled in Carson v. Federal Street & Pleasant Valley Ry. Co., 147 Pa. 219, that the owner of a vehicle being driven for him is affected by the contributory negligence of the driver, which aids in causing injury to or destruction of the vehicle, and cannot recover, therefore, from a third party who has also negligently contributed to the injury or destruction [is still the law]. As said in the opinion in the case last mentioned, such negligence "justly defeats the action brought to recover from another damages that were self-inflicted."

"There is a difference where the owner sends a driver to manage and control the team and vehicle, for, in so doing, the owner retains the control, and may well be held accountable for the action of the driver, his servant and agent:" Mr. Justice Potter in Gibson v. Bessemer & Lake Erie R. R. Co., 226 Pa. 198, 202.

Where a person undertakes voluntarily to perform service for another, who assents thereto, he stands in the relation of a servant to the latter: McMahon v. White, 30 Pa. Superior Ct. 169.

It is not necessary in order to constitute the driver of an automobile the representative, servant or agent of the owner in the management of it that he should be entitled to compensation, or that he was in the performance of a duty incident to a general employment as the servant of the owner: Wollaston v. Park, 47 Pa. Superior Ct. 90. If he be acting for the owner and is injuriously negligent, the owner is affected by such negligence.

Even if the automobile in the present instance had been loaned to Mr. Newton, it does not follow that plaintiff would be entitled to recover from the defendant, notwithstanding the contributory negligence of the driver whom plaintiff sent with it to control, manage and perform the driving. Still, the driver's negligence would bar plaintiff from recovering from defendant for the injury sustained: Matlack v. Chalfant, 69 Pa. Superior Ct. 49.

After careful consideration, we are unconvinced there was any error in entering the compulsory non-suit.

#### Order.

And now, Dec. 30, 1922, after hearing and due consideration, the rule to show cause on the motion to set aside the judgment of non-suit is discharged, and the court refuses to set aside the non-suit.

To which refusal of the court plaintiff then and there excepts, and at its request a bill of exceptions is sealed.

From Raymond E. Brown, Brookville, Pa.